UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Lissa Cottrell,

      Plaintiff,

v.

                                      **MEMORANDUM OPINION
AND ORDER**
Civil No. 10-3154 (MJD/JJK)

CostCo Wholesale Corp.,

      Defendant.

_____

Tammy P. Friederichs and Steven M. Thompson, Friederichs & Thompson, P.A., Counsel for Plaintiff.

Gerald L. Pauling, II, Erin Dougherty Foley, and Annette Tyman, Seyfarth Shaw LLP, and Joseph G. Schmitt, Nilan Johnson, P.A., Counsel for Defendant.

_____

This matter is before the Court on Defendant CostCo Wholesale Corp.'s ("CostCo") motion for summary judgment.

**FACTUAL BACKGROUND**

Plaintiff was an employee of CostCo from February 2006 until she was terminated in November 2009. At the time she was terminated, Plaintiff worked in the photo lab of the CostCo Eden Prairie facility and reported to Michael Johnson. Hal McCullum was the Assistant Store Manager, and Sandy Wakefield-

Lemaniak was the Store Manager.  Wakefield-Lemaniak reported to Regional

Operations Manager, Wendy Davis.

In the fall of 2008, Johnson hired a friend, Phil Hutchens, as a part-time,

seasonal employee in the Eden Prairie photo lab.   During prior employment at

CostCo, Hutchens allegedly made sexual comments to various female employees,

including Emmy Jaenicke, Bobbi Jo Klevin and Ariel Newman.  For example,

Hutchens allegedly whispered to Jaenicke "I'd rather have sex with an

experienced woman than those young girls."  (Friederichs Aff. Ex. A.)  Plaintiff

confided to Jaenicke that Hutchens' comments also made her uncomfortable, and

that on one occasion, Johnson made an inappropriate comment to Plaintiff -

stating that he would play music in the photo lab that he liked to have sex to.

(Plaintiff Dep. at 149.)

Plaintiff alleges that on November 7, 2008, Hutchens propositioned her,

stating "Do you want to get undressed?"  (Plaintiff Dep. at 96.)  Plaintiff reported

the comment to Wakefield-Lemaniak, and thereafter McCullum conducted an

investigation.  (McCullum Dep. at 39-42; Plaintiff Dep. at 95-96.)  When

questioned by Wakefield-Lemaniak, with Plaintiff present in the room, Hutchens

denied making the comment.  (Plaintiff Dep. at 109.)  Thereafter, Plaintiff and

Hutchens were to be scheduled so that they would not work with each other.  (Id. at 110.)  On one occasion, however, Johnson scheduled Plaintiff and Hutchens so that their shifts did overlap for a short period of time.  (Id. at 110-11.)

After the investigation against Hutchens was completed, McCullum concluded that Hutchens had a history of making female employees feel uncomfortable by his actions and comments.  (Friederichs Aff. Ex. C.)  Hutchens received a written memorandum from Wakefield-Lemaniak, informing him that the investigation did not reveal whether Hutchens had or had not committed workplace harassment.  (Foley Aff. Ex. 7.)  He was also reminded of CostCo's Anti-Harassment Policy and informed that "the allegations already made against you may be taken into account in evaluating any future alleged violations of our anti-harassment policy."  (Id.)

During times when Hutchens was not working, he was nonetheless present at the store on a routine basis to shop.  Plaintiff alleges that during these times, Hutchens would stare and laugh at Plaintiff.  (Plaintiff Dep. at 112.)  Plaintiff complained to Wakefield-Lemaniak and Davis, but the conduct continued.  McCullum told Plaintiff there was nothing to do, as Hutchens was

rightfully there as a member/shopper.  McCullum told her that if she was uncomfortable about Hutchens coming in while she was working, that she should talk with Johnson, or another manager, and that they would take care of the situation.  (McCullum Dep. at 52.)   Plaintiff asserts, as a self-help measure, she began to take pictures of Hutchens staring at her.  (Foley Aff. Ex. 12.) Plaintiff was later told that she could not take pictures while she was working, and that Hutchens had a right to shop at the store, as he was a member.  (Id.)

After the investigation involving Hutchens, Plaintiff asserts that Johnson retaliated against her in various ways.  For example, when Plaintiff requested assistance, Johnson would walk away.  (Friederichs Aff. Ex. D.)   Johnson also allegedly displayed anger - kicking boxes and equipment - in Plaintiff's presence. (Id.)  Plaintiff further alleges that Johnson engaged in other forms of retaliation, such as throwing away her insulin, sending her home when a corporate representative was scheduled to visit, and dumping chemicals down a drain. (Id.)   Plaintiff filed a complaint against Johnson in December 2008.  (Plaintiff Dep. at 192-93; Wakefield-Lemaniak Dep. at 34; McCullum Dep. at 45.)

McCullum conducted an investigation into Plaintiff's complaint against Johnson, and found merit to some of her allegations.  For example, Johnson

4

admitted to displaying anger in front of Plaintiff, and other employees reported

seeing Johnson dump chemicals down a drain.  (McCullum Dep. at 46;

Friederichs Aff. Ex. E.)  In a formal written warning, Johnson was notified that it

had been determined that he had engaged in inappropriate behavior for a person

in his position, "even if it did not amount to a violation of the Company's anti-

harassment policy."  (Foley Aff. Ex. 8.)  He was informed that "further

inappropriate conduct on your part will result in further disciplinary action, up

to and including immediate termination of your employment."  (Id.)

In February 2009, Plaintiff alleges that she was also subjected to sexual

harassment by another co-worker, Bill Schwirtz.  She alleges she overheard

Schwirtz tell another co-worker that he wanted to get in the sheets with Plaintiff.

(Plaintiff Dep. at 97.)  Plaintiff further alleges that Schwirtz leered at her while

she worked, and that he aggressively pushed a cart at her, blocked her path and

refused to move when she tried to gain access to the time-clock.  (Id. at 147-48.)

Plaintiff reported this behavior, and McCullum discussed Plaintiff's concerns

with Schwirtz.  (McCullum Dep. at 54-56.) Schwirtz was told to change his work

position so that he was not looking in Plaintiff's direction.  (Id. at 56.)  Schwirtz

was issued a counseling notice, as he did not immediately cease his behavior of

staring at employees in the photo lab.  He was directed to immediately stop such behavior in order to avoid further discipline.  (Foley Aff. Ex. 20.)

In April 2009, Plaintiff alleges that Johnson changed her work schedule without notifying her, and that she missed a shift as a result.  (Plaintiff Dep. at 217.)  When she returned for her regularly scheduled shift, Wakefield-Lemaniak asked her why she had missed a shift, and Plaintiff explained that she was not aware of the shift change.  Plaintiff asserts that Wakefield-Lemaniak told her it was no big deal, yet Johnson issued her a counseling notice.  (Johnson Dep. at 29, Friederichs Aff. Ex. H.)

On May 6, 2009, Plaintiff talked with Joe Dupuis, Regional Photo Manager, about several issues, such as Johnson short-staffing the photo lab and that Johnson would not complete DVD transfer orders.  Plaintiff also complained of not getting sufficient training.  Dupuis looked into Plaintiff's concerns, and also talked with Johnson and Wakefield-Lemaniak, and made recommendations to address her concerns.  (Foley Aff. Ex. 13.)

On May 9, 2009, Wakefield-Lemaniak issued a second disciplinary notice to Plaintiff for absenteeism.  (Id. Ex. 15.)  Plaintiff refused to sign the notice, claiming that her absences were caused by the harassment, abuse, and retaliation

she suffered at the workplace, which in turn caused her to suffer neck and chest

pains.  (Id. at 240-41.)  Plaintiff requested FMLA paperwork, which she thereafter

completed and turned in.  (Friederichs Aff. Ex. J.)

On May 16, 2009 Plaintiff complained to Davis that Johnson and

Wakefield-Lemaniak were retaliating against her, that she was forced to work in

a hostile environment, and that Wakefield-Lemaniak and Johnson were good

friends.  (Id. Ex. K.)  Plaintiff also complained that Johnson told a co-worker,

Ariel Newman, that he was trying to get Plaintiff to quit.  (Id.)  She also believed

that Johnson was changing her schedule in order to trick her into not showing up

for a shift.  (Id.)

An investigation was conducted.  In a memorandum to Davis following

the investigation, McCullum reported that Plaintiff clearly believed she could not

be successful working in the Eden Prairie store, that she had initiated numerous

complaints, that management could not substantiate retaliatory conduct on

behalf of Sandy Lemaniak [Wakefield] or Johnson, and that the relationship

between Plaintiff and Johnson was irreparable.  (Friederichs Aff. Ex. K.)

McCullum reported that while Plaintiff believed that Johnson's behavior had

improved, she still had concerns as Johnson continued to display frustration with

7

employees and members, and made threats that he could easily get Plaintiff fired or transferred.  (Id.)

Based on McCullum's findings, Johnson was issued another formal written warning and was informed that he was again found to have engaged in some inappropriate conduct - but not a violation of the anti-harassment policy.  (Foley Aff. Ex. 19.)  McCullum prepared a closure letter to Plaintiff, reporting that no finding could be made that the company's harassment policy had been violated. (Foley Aff. Ex. 17.)

Plaintiff alleges that she continued to be subjected to sexual harassment, this time by co-worker Tony Vasquez.  Plaintiff alleges that Vasquez forced her to watch a video of him masturbating, and that he sent her numerous pictures via phone text of his erect penis.  (Id. Ex. L.)  Plaintiff reported Vasquez's behavior to Johnson, telling Johnson only that she "was having problems with Tony that's been coming back here, like with Phil." (Plaintiff Dep. at 91.)  She did not explain to Johnson the types of problems she was having with Vasquez.  (Id.)  Johnson allegedly told Plaintiff that he didn't want to hear about it and walked away. (Id.)  At no time did Plaintiff report any specific allegations concerning Vasquez to McCullum, Wakefield-Lemaniak or any other store manager.  (Id. at 90, 154-

55.)

On June 26, 2009, several employees attended a going away party for McCullum.  The next day, Plaintiff asserts that several employees were hung over or were perhaps still intoxicated from the night before.  Plaintiff called corporate headquarters to voice her concern that employees were potentially violating the company's alcohol policy by working while intoxicated.  (Plaintiff Dep. at 322-23.)  After leaving the message, Plaintiff did not successfully disconnect her phone, and a conversation with coworker Tommy May was recorded on the voicemail.  (Foley Aff. Ex. 21.)   In the recording, May is heard asking Plaintiff follow up questions, such as how would corporate get back to her.  At the end of this conversation, May told Plaintiff not to call Wendy Davis because he thought she was "fucking Hal."  (Id.)  Plaintiff responded "She is."  (Id.)

When corporate HR representative Christine Baker retrieved Plaintiff's voicemail, the information was forwarded to Davis.  Because of the comment made about Davis, the matter was then referred to Louie Silveira to handle the investigation.  On July 5, 2009, Silveira traveled to Eden Prairie to investigate Plaintiff's complaint and May's statement concerning Davis.  Plaintiff asserts that

she told Silveira about the possibility of intoxicated employees and her fear of

retaliation.  (Plaintiff Dep. at 325.)  Silveira then met with a number of additional

employees, including May, McCullum, Newman and Allison Turgrow.  Upon

completing his investigation, Silveira concluded that the managers made a few

mistakes in planning the going away party for McCullum and exercised poor

judgment.  (Silveira Dep. at 15-16.)  Discipline was issued, but not by Silveira.

(Id.)

Silveira also found Plaintiff to be a disgruntled employee, toxic, not

rational because of her belief that she was being retaliated against and that her

complaints were never remedied.  (Friederichs Aff. Ex. O.)  He also thought

Plaintiff should be suspended for participating in malicious gossip, as evidenced

by the voicemail to Baker, which captured the conversation between May and

Plaintiff concerning Davis and McCullum having a sexual relationship.  (Id.)

On July 6, 2009, Plaintiff was suspended for participating in malicious

gossip.  At the suspension meeting, she refused to sign the suspension notice.

(Wakefield-Lemaniak Dep. at 55-56, Foley Aff. Ex. 23.)  Plaintiff instead stated

that she wanted to prepare a written response, which she submitted the next day.

(Wakefield-Lemaniak Dep. at 56; Foley Aff. Ex. 22.)  In her written statement,

10

Plaintiff admitted telling May that she did not want to call Wendy Davis because "Wendy's screwed Hal." (Id.)

Plaintiff returned to work after her suspension on July 18, 2009, and was directed not to "make anymore comments or statements regarding anyone associated with CostCo in or out of her location." (Foley Aff. Ex. 24.) She was further directed to bring any concerns to the attention of the warehouse manager and that "[a]ny further violations [Plaintiff] will be terminated." (Id.) On August 13, 2009, Tommy May reported that Plaintiff had approached him on either July 18 or 19, 2009, seeking information on managers because she was building a case against CostCo. (Id. Exs. 25 and 26.) May allegedly told Plaintiff that he did not want to talk with her, as they had just returned to work after suspension for engaging in malicious gossip. (Id.) May reported that Plaintiff confronted him on a number of occasions seeking information, and that May repeatedly told her he did not want to talk with her. (Id.) Wakefield-Lemaniak and Baker thereafter launched an investigation into Plaintiff's actions. Almost immediately, Plaintiff took medical leave. (Wakefield Dep. at 65; Baker Dep. at 28.)

According to Plaintiff, her work environment became even more hostile once she returned from suspension. She claims that Vasquez continued to send

11

her offensive photos, and that one day while sitting in her truck during a break, Vasquez got into her car and told her he was going to "jack off" in front of her, while unzipping his pants.  (Plaintiff Dep. at 90.)  Plaintiff told him to get out of the truck, which he did.  Plaintiff did not report the incident, as she felt all avenues of complaint had been cut off.  (Id. at 90-91.)

Plaintiff asserts that because of her hostile work environment in August 2009, her neck "locked up" and she experienced a lot of pain as a result.  (Plaintiff Dep. at 240; Friederichs Aff. Ex. Q.)  On August 28, 2009, Plaintiff had surgery and went on medical leave.  (Plaintiff Dep. at 365.)  While on medical leave, Plaintiff requested a transfer to another store, but the request was not granted as there was no position available at that store.  (Plaintiff Dep. at 444-45; Foley Aff. Ex. 36.)

When Plaintiff returned to work in early November 2009, she discovered that Hutchens had been rehired and was working in the photo lab.  (Johnson Dep. at 52.)  Plaintiff alleges that soon thereafter, Hutchens resumed his harassment of Plaintiff, including staring her up and down, blocking her path and by making belittling comments toward her.  (Plaintiff Dep. at 114; Friederichs Aff. Ex. S.)  Plaintiff sought out the new Assistant Manager, David

Oertle, to find out why Hutchens was scheduled to work in the photo lab.  Oertle

told her to talk to Wakefield-Lemaniak, as it was "Sandy's lab."  (Plaintiff Dep. at

398-99.)   Plaintiff also told Ter Lor, a loss prevention employee, that she believed

Hutchens was rehired in the photo lab to force Plaintiff to quit.  (Friederichs Aff.

Ex. S.)

Plaintiff alleges that at this time she was also sexually harassed by Bill

Schwirtz when he brushed up against her twice while working in the photo lab.

(Plaintiff Dep. at 134, 144-45.)  Plaintiff reported Schwirtz's conduct to Troy

Myers.  (Friederichs Aff. Ex. T.)

On November 6, 2009, Baker called Plaintiff as part of the investigation that

had commenced before Plaintiff left on medical leave.  (Plaintiff Dep. at 365, 413;

May Decl. ¶¶ 11-12; Wakefield Dep. at 67; Baker Dep. at 27-28.)   At the

beginning of the conversation, Baker told Plaintiff that she was following up on

some things following her suspension.  (Id. Ex. U.)  Baker did not tell Plaintiff

that she was the subject of an investigation.  (Id.)  Baker did, however, tell

Plaintiff the conversation was confidential, and told her not to talk with anyone

about the conversation, and that if she did it could be considered interfering with

an investigation.  (Id.)  Baker also told Plaintiff that she should take the

opportunity to provide her set of facts.  (Id.)  Plaintiff did not want to speak with

Baker, and told her so.  (Id.)

Thinking that May was her friend and supporter, Plaintiff tried to contact

him.  May did not answer her phone calls, and Plaintiff then sent him some text

messages.  (Foley Aff. Ex. 29.)  May eventually told Plaintiff that he did not want

to get into trouble and that he could not help her.  (May Dep. at 60.)  May then

reported that Plaintiff was trying to contact him.  Specifically, he reported that

Plaintiff called him on November 6, 2009, that she was frantic and wanted to

know why she was pulled into the office and questioned about her contacts with

May.  (Foley Aff. Ex. 29.)  She also asked May "to tell her everything" and that he

if was called into the office, that he should giver her a "thumbs up."  (Id.)

Although May told Plaintiff he did not want to talk to her, she continued to call

him.  May then allowed Wakefield-Lemaniak to take pictures of his phone

showing Plaintiff's text messages.  (Foley Aff. Exs. 29 and 30.)

Construing Plaintiff's attempts to speak with May to be interfering with an

investigation, Wakefield-Lemaniak suspended Plaintiff on November 9, 2009.

(Foley Aff. Ex. 31.)  Thereafter, Wakefield-Lemaniak informed corporate of

Plaintiff's actions, and of her suspension.  The decision was then made to

14

terminate Plaintiff's employment.  (Id. Ex. 32.)

Wakefield-Lemaniak testified that she recommended termination - not that she did make the decision to terminate.  (Wakefield-Lemaniak Dep. at 58, 95.) According to CostCo corporate policy, Wakefield-Lemaniak did not have the authority to terminate Plaintiff, because Plaintiff had been employed with CostCo for over two years.  (Id. at 96; Foley Aff. Ex. 1, p. 26.)  Per this policy, Wakefield-Lemaniak could recommend the discipline, and the final decision was left to John Gaherty and Doug Schutt.  (Id. at 95.)  CostCo asserts that the final decision to terminate was made by Gaherty and Schutt.

**STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  This burden can be met "by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  The party opposing summary

15

judgment may not rest upon mere allegations or denials, but must set forth

specific facts showing that there is a genuine issue for trial.  Krenik v. County of

Le Sueur, 47 F.3d 953, 957 (8th Cir.1995).

**DISCUSSION**

**A.    Sexual Harassment**

Plaintiff alleges in her Complaint that she was subjected to unlawful sexual

harassment by her co-workers, including comments of a sexual nature, sexual

advances, sexual overtures, and sexual references and innuendo, in violation of

Title VII, 42 U.S.C. § 2000e et seq. and the Minnesota Human Rights Act

("MHRA"), Minn. Stat. § 363A.08, subd. 2(3).[1]

"A hostile work environment arises when sexual conduct has the purpose

or effect of unreasonably interfering with an individual's work performance or

creating an intimidating, hostile, or offensive working environment."  Anda v.

Wickes Furniture Co., Inc., 517 F.3d 526, 531-32 (8th Cir. 2008) (quoting Vajdl v.

Mesabi Acad. of KidsPeace, Inc., 484 F.3d 546, 549-50 (8th Cir. 2007)).  "'Title VII

does not prohibit all verbal or physical harassment and it is not a general civility

---

[1]Claims arising under the MHRA are analyzed under federal law developed under Title VII.  Bahr v. Capella Univ., 788 N.W.2d 76, 83 (Minn. 2010).

code for the American workplace.'" <u>Wilke v. Dept. of Health and Human Servs.</u>, 638 F.3d 944, 953 (8th Cir. 2011).  To be actionable, a plaintiff must demonstrate "that discriminatory intimidation, ridicule, and insult permeated the workplace." <u>Id.</u>  The standard is a demanding one, and the factors to be considered in determining whether a hostile work environment existed include "the frequency and severity of the conduct, whether it [was] physically threatening or humiliating and whether it unreasonably interfere[d] with the plaintiff's job performance." <u>Id.</u>

"To establish a prima facie hostile work environment claim, a plaintiff must prove: (1) that she was a member of a protected group; (2) the occurrence of unwelcome harassment; (3) a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." <u>Anda</u>, 517 F.3d at 531-32.

Plaintiff alleges that she was subjected to a hostile environment and points to the following incidents in support: pictures sent to her by co-worker Tony Vasquez of his erect penis; Vasquez forced her to watch sexual videos and asked

her to participate in phone sex and sought to engage in a sexual act in her

presence; Schwirtz leered at her in a creepy way; Hutchens sexually

propositioned her, stared at her and engaged in aggressive behavior; Johnson

made a sexual comment to her.

With respect to the allegations concerning Vasquez, Plaintiff concedes that

she did not report to CostCo management that she received inappropriate photos

from Vasquez, or reported any information about the type of conduct she now

alleges against Vasquez.  (Plaintiff Dep. at 90, 154-55.)  Plaintiff admits that she

only told Johnson that she was having problems with Vasquez "like with Phil."

The allegations against Hutchens are not similar to the allegations she asserts

against Vasquez, however.  For example, Plaintiff never told a manager that

Hutchens sent her pornographic pictures, or had asked her to engage in phone

sex or anything of that nature.  Plaintiff claims that she did not report Vasquez's

conduct because she believed she no longer had avenues available to her through

which to report Vasquez's conduct.  (Id. at 155.)  But the record clearly

demonstrates that during the time Vasquez was allegedly harassing her - from

January through August 2009 (id. at 89), Plaintiff made numerous complaints

about other co-workers.  Because Plaintiff did not give CostCo a reasonable

opportunity to address any inappropriate conduct by Vasquez or Johnson,

CostCo cannot be held liable for such conduct.  See Anda, 517 F.3d at 531-32

(finding claim of sexual harassment without merit where plaintiff did not give

employer a reasonable opportunity to correct the intolerable working conditions).


While Plaintiff did report many complaints about Johnson concerning his

anger issues, scheduling of Plaintiff and other issues, it does not appear that she

reported to a store manager that Johnson made an inappropriate sexual comment

to Plaintiff.  Even if she had reported the comment, the Court finds that such

comment, together with the reports involving Hutchens and Schwirtz, do not

meet the demanding standard applicable to claims of sexual harassment - that is

the allegations do not raise a fact question that Plaintiff's "workplace [was]

permeated with discriminatory intimidation, ridicule, and insult that [was]

sufficiently severe or pervasive to alter the conditions of [her] employment and

create an abusive working environment."  Vajdl, 484 F.3d at 549-50.

Johnson and Hutchens are alleged to have made only one sexual comment

to Plaintiff, and Hutchens is alleged to have stared and laughed at her while he

shopped at CostCo.  Schwirtz is also alleged to have stared and leered at Plaintiff,

and to have purposely brushed up against her while passing her in the Photo lab.

A review of cases from this circuit demonstrates how difficult it is to meet the high standard governing claims of hostile work environment.  For example, in Wilkie, the Eighth Circuit held that rumor-spreading that the plaintiff was having an affair was not so severe or pervasive that it met the high threshold for a hostile work environment.  638 F.3d at 953.  In another case, the Eighth Circuit rejected a hostile environment claim based, inter alia, on allegations that a supervisor became hostile toward the plaintiff when she rejected his advances, and told plaintiff before she could be considered for a pay increase or different position, that she would have to draw the planter he kept in his office, "that was shaped like a slouched man wearing a sombrero.  The planter had a hole in the front of the man's pants that allowed for a cactus to protrude."  Duncan v. Gen. Motors Corp., 300 F.3d 928, 931 (8th Cir. 2002).   The court found that although the supervisor's conduct was "boorish, chauvinistic, and decidedly immature, [] we cannot say they created an objectively hostile work environment permeated with sexual harassment."  Id. at 935.  See also Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 420 (8th Cir. 2010) (finding allegations that co-worker "made sexually inappropriate comments, including about [plaintiff's] breasts on several

occasions, and that [co-worker] told [plaintiff] that he was fixing a table so she

could 'strip dance on it'" did not establish actionable harassment); <u>Vajdl</u>, 484 F.3d

at 551-52) (finding allegations that over a period of three months a co-worker

made numerous comments about plaintiff's body, touched her hair, wiped water

off her pant leg, repeatedly suggested she leave her boyfriend and go on dates

with him, telephoned her at home, and offered to buy her a drink and give her a

ride home, not actionable harassment).  Finally, the Eighth Circuit recently

reaffirmed that as to incidents of isolated propositioning, "'[m]ore than a few

isolated incidents are required'" to support a hostile work environment claim.

<u>E.E.OC. v. CRST Van Expedited, Inc.</u>, __ F.3d __, 2012 WL 555510, at *21 (8th Cir.

Feb. 22, 2012).

Because Plaintiff has failed to establish a prima facie case of sexual

harassment/hostile work environment, this claim must be dismissed.

**B.     Retaliation**

To establish a prima facie case of retaliation, Plaintiff must show: that she

engaged in statutorily protected conduct; a reasonable person would have

perceived the alleged retaliatory action to be materially adverse; and a causal

connection exists between participation in the protected activity and the adverse

employment action.  <u>Sutherland v. Mo. Dep't. of Corr.,</u> 580 F.3d 748, 752 (8th Cir.

2009).

 If Plaintiff establishes a prima facie case of retaliation, the burden then

shifts to CostCo to produce a legitimate, non-retaliatory reason for its

employment actions.  If CostCo meets its burden, then Plaintiff must prove that

the CostCo's stated reasons are a pretext for discrimination.  <u>Clegg v. Arkansas</u>

<u>Dept. of Corr.,</u> 496 F.3d 922, 928 (8th Cir. 2007) (court noted that the <u>McDonnell</u>

<u>Douglas</u> framework was to be used to analyze the plaintiff's retaliation claim).

To prove pretext, Plaintiff must both discredit CostCo's asserted reasons for its

employment actions and show the circumstances permit drawing a reasonable

inference that the real reason for the CostCo's employment decisions was

retaliation.  <u>Gilbert v. Des Moines Area Comm. College</u>, 495 F.3d 906, 918 (8th

Cir. 2007).

 For purposes of this motion, CostCo concedes that Plaintiff engaged in

protected activity and that she suffered an adverse employment action when she

was suspended, and later terminated.  CostCo argues that it is nonetheless

entitled to summary judgment as to the retaliation claim because Plaintiff cannot

show a causal connection between her protected activity and the adverse

22

employment actions.

Plaintiff argues that her retaliation claim is based on many retaliatory actions in addition to being suspended and terminated from employment.  Such additional adverse actions include: forcing Plaintiff to meet with Hutchens to discuss her complaints of sexual harassment against Hutchens; Johnson subjecting her to a retaliatory and hostile work environment by throwing things, leaving her to work alone in the lab, throwing away her insulin and leaving extra work for her, contaminating equipment and changing her work schedule without notifying her which caused her to be disciplined for absenteeism; rehiring Hutchens in the photo lab and scheduling their shifts to overlap; and repeatedly disciplining Plaintiff for absenteeism and for other concerns on her performance log.

To constitute an adverse employment action for purposes of a retaliation claim, the adverse action must be considered material - that it would have dissuaded a reasonable worker from engaging in the protected activity. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  The Court must keep in mind, however, that "Title VII . . . does not set forth 'a general civility code for the American workplace.'"  Id.  "An employee's decision to report

discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id.  In deciding whether an adverse action is material, such action must be looked at in context.  Id.  "'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical act performed.'"  Id. at 69 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81-81 (1998)).

Viewing the facts in context and in the light most favorable to Plaintiff, the Court finds that Plaintiff has demonstrated that fact questions exist as to whether Plaintiff was subjected to adverse employment actions that are causally connected to protected activity.  As demonstrated above, Plaintiff reported to management that she was she was being sexually harassed by Hutchens in the fall of 2008 and by Schwirtz in February 2009.  She reported concerns about Johnson in December 2008, and in April and May 2009.  One of the concerns she raised about Johnson was that he changed her shift without telling her, causing her to be disciplined for absenteeism.  She also reported concerns about employees being intoxicated at work in late June 2009.  In making this report, she

24

is overheard agreeing with Tommy May that two managers were having a sexual affair - which is the conduct for which she was initially suspended in July 2009.

As Plaintiff has put forth sufficient evidence of a prima facie case to withstand summary judgment, the next step in analyzing a retaliation claim requires CostCo to put forth a legitimate reason for suspending, and ultimately terminating Plaintiff's employment. CostCo asserts the evidence demonstrates that Plaintiff's suspension and termination were brought about by her own conduct. She was disciplined for engaging in malicious gossip and terminated after CostCo learned that Plaintiff had interfered with an investigation by discussing the investigation with a coworker, even though she had been informed that the investigation was confidential.

To show pretext, Plaintiff may put forth evidence "that the employer's explanation is unworthy of credence because it has no basis in fact" or "by persuading the court that a prohibited reason - more than the proffered reason - likely motivated the employer." Tyler v. Univ. or Ark. Bd. of Trustees, 628 F.3d 980, 988-89 (8th Cir. 2011).

The record demonstrates that Plaintiff and Tommy May were suspended in July 2009 for engaging in malicious gossip - specifically that both made

statements to the effect that two store managers were having a sexual affair.

Plaintiff admitted to making such a statement.  (Foley Aff. Ex. 22.)  When she

returned to work after suspension, she was directed not to "make anymore

comments or statements regarding anyone associated with CostCo in or out of

her location."  (Id. Ex. 24.)  She was also informed that if she committed further

violations, she would be terminated.  (Id.)

In August 2009, May reported that on or about the day Plaintiff returned to

work after suspension, she approached him seeking information on managers as

she was building a case against CostCo.  An investigation was commenced based

on May's reports that Plaintiff violated instructions not to engage in gossip about

CostCo employees.

The record further demonstrates that at the beginning of their conversation

on November 6, 2009, Baker informed Plaintiff "This is part of an investigation

and I need to remind you that this conversation must be kept confidential.  Make

sure you don't discuss this conversation with anyone.  I would hate to find you

in a position of interfering with an investigation so let's avoid that and keep

everything confidential."  (Foley Aff. Ex. 28; Friederichs Aff. Ex. U.)  Plaintiff was

thus directed not to discuss the conversation with anyone, not that she should

not discuss the subject of the investigation.

Plaintiff disputes the contention that she continued to engage in malicious gossip after her suspension, and she further disputes that she talked with May about her conversation with Baker.  (Plaintiff Dep. at 427.)  Plaintiff thus argues that there is a clear fact question as to whether she was fired for engaging in protected activity.

Engaging in protected activity "does not insulate an employee from the consequences of violating company policy."  Alvarez, 626 F.3d at 416.  Thus, to prove pretext, Plaintiff must do more than assert that she disagrees with CostCo's assessment of her behavior, she must present evidence that "create[s] a real issue as to the genuineness of the supervisor's perceptions and beliefs."  Hervey v. County of Koochinching, 527 F.3d 711, 725 (8th Cir. 2008).  "As long as [the employer] honestly believed that [plaintiff] violated company policy, and acted on that basis, [the employer] is not liable for discrimination, even if a trier of fact would disagree with its finding."  Alvarez, 626 F.3d at 416.  The Court must focus on whether Plaintiff can show that a genuine issue of material fact exists as to whether CostCo terminated her because she engaged in protected activity rather than because CostCo believed she violated company policy.  Id.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that fact questions exist as to whether a prohibited reason, more than the proffered reason, motivated CostCo to terminate Plaintiff's employment. Plaintiff disputes whether she continued to engage in gossip and that she discussed the November 6, 2009 Baker conversation with Tommy May.  More importantly, however, is the fact that Wakefield-Lemaniak became aware that in July and August 2009, Plaintiff was attempting to collect evidence for a lawsuit against CostCo, and that Plaintiff was specifically seeking information on Wakefield-Lemaniak.  (Foley Aff. Ex. 26.)  While Wakefield-Lemaniak did not make the decision to terminate, she did make that recommendation to the decision-makers.  (Wakefield-Lemaniak Dep. at 58, 95.)  There is thus a fact question as to whether CostCo was more concerned about Plaintiff's potential lawsuit than a violation of company policy.

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment

[Doc. No. 16] is GRANTED as to Count I (Sexual Harassment) and DENIED as to

Count II (Retaliation).


Date:   April 3, 2012

                              s/ Michael J. Davis
                              Michael J. Davis
                              Chief Judge
                              United States District Court



Civil No. 10-3154.